IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Case No. 24-CR-00085-SEH |
| MICHAEL SHANE BLACKFORD, | |
| Defendant. | |

## OPINION AND ORDER

Before the Court is Defendant's Opposed Motion to Suppress. [ECF No. 28]. Defendant Michael Blackford seeks to suppress his statements given during a custodial interview with Tulsa Police Department law enforcement officials. [*Id.*]. The government has responded to Defendant's motion.[1] For the reasons provided below, the motion is denied.

## I. Background

A federal grand jury charged Blackford with three offenses: (1) two counts of second-degree burglary in Indian country, in violation of 18 U.S.C. §§ 1151, 1153, and 21 Okla. Stat. §§ 1435, 1436; and (2) one count of theft in Indian country – Over $1,000, in violation of 18 U.S.C. §§ 1151, 1153, 661.

---

[1] It appears that the government filed their response to the motion out of time. Because Defendant has not objected to the lateness of the government's filing, the Court will not address that issue.

Detectives and/or officers[2] with the Tulsa Police Department interviewed Blackford and another suspect in relation to the charged offenses. After the officers interviewed the first suspect, Blackford was put in the same interrogation room to speak with them. He was given a can of soda, and the officers promptly entered the room. [ECF No. 28-1 at 35:37–35:58]. Blackford was unrestrained during the interview, wore plain clothes, and appeared relaxed as the questioning began. [*Id*. at 36:03]. He appeared reasonably calm, engaged, and provided appropriate and reasonably prompt answers to all questions throughout the questioning.

Hanna introduced herself and the other officer. She told Blackford: "I'm sure it's not a big surprise you guys are here." [*Id*. at 36:03–36:13]. Hanna then took his background information, including his name, education level, and relationship status. [*Id*. at 36:13–36:54]. Hanna then immediately read

---

[2] The parties inconsistently identify the law enforcement officials who interrogated Defendant as either detectives or officers. These individuals are identified as "Linda" and "Rob" in the video exhibits, and the government refers to these individuals as Detective Hanna and Officer Martin. [ECF No. 34 at 2]. However, it is clear enough that only two officers and/or detectives participated in the interrogations. The female detective with the last name Hanna was the only law enforcement official who asked questions, and the male law enforcement official simply observed. In the interest of clarity, the Court will refer to the female law enforcement official as "Hanna." Additionally, Defendant and the government each provided separate video exhibits of the interrogation at issue. These videos depict the same interrogation, but are from different camera viewpoints. In the interest of clarity, the Court will only cite to Defendant's Exhibit 1, and time stamp citations are to the time elapsed on the video file submitted to the Court–not the time stamp that appears at the top, left-hand corner of the video.

Blackford his *Miranda* rights, and specifically informed him: (1) he had the right to remain silent and that he did not have to answer any questions or make any statements; (2) that anything he said could be used against him in court; (3) he had the right to talk to a lawyer before they asked any questions and to have him or her present during questioning; (4) if he could not afford a lawyer, one would be provided before he is asked any questions; (5) that he could answer questions without a lawyer present; and (6) he could stop answering questions at any time. [*Id.* at 36:54–37:19]. Hanna then asked Blackford if he understood his rights, and he nodded in the affirmative and verbally confirmed that he did. [*Id.*]. Blackford then answered all of Hanna's questions. [*Id.* at 37:19–49:46].

After confirming that Blackford understood his rights, Hanna told him what she believed happened with respect to the charged offenses. [*Id.* at 37:32–38:34]. Hanna also acknowledged that Blackford and the other suspect had an addiction problem. *E.g.,* [*Id.* at 39:25–39:34; 40:55–41:34]. Hanna asked Blackford if he knew what happened to the stolen property at issue; he indicated that it was not pawned, but most of it was traded. [*Id.* 39:22–40:25; 44:50–45:06]. He also stated that for one of the burglaries, he went in through an unlocked fence and came back out the front door. [*Id.* at 44:15–44:30]. Additionally, he confirmed that he was native. [*Id.* at 41:17–41:30]. In fact, when Hanna told him the case would "go federal," he responded "thank

3

you *McGirt*." [*Id.* at 46:45–47:50]. The Court assumes Blackford was referring to *McGirt v. Oklahoma*, 591 U.S. 894 (2020).

Although Hanna appeared to provide Blackford with a form for him to sign to waive his *Miranda* rights, he did not sign the form until the end of the interview. [36:54–37:32; 48:25–48:45]. The government represents that the police cannot find the signed form. [ECF No. 34 at 4].

## II. Discussion

Blackford now asks the Court to suppress the statements he made during the interrogation based on two main grounds: (1) the *Miranda* warning given to him was defective; (2) and that he was not given an opportunity to invoke his Fifth Amendment rights.

Blackford argues that his *Miranda* warning was ineffective because the warnings were "rapid" and "coupled with [Hanna's] failure to signal to [Blackford] that she was informing him of his rights." [ECF No. 28 at 7]. In Blackford's view, Hanna "downplayed her reading of the rights so significantly that she did not reasonably convey to [him] his rights." [*Id.* at 8]. Blackford argues that he was not given an opportunity to invoke his Fifth Amendment rights, primarily because the officers did not ask him "if he wished to invoke any of the rights just listed." [*Id.*]. He further argues that Hanna continued her interrogation so quickly that he "did not have a meaningful opportunity to reflect on the implications of the rights and

formulate a response," and that Hanna continuously interrupted him after providing him a written *Miranda* waiver. [*Id*. at 8–9]. Blackford finally argues that this conduct was particularly problematic in light of his methamphetamine addiction. [*Id*. at 9].

In response, the government argues that Blackford waived his *Miranda* rights knowingly, voluntarily, and intelligently. In particular, the government asserts: Blackford specifically acknowledged that he understood his rights; he waived his rights by continuing to answer questions after being informed of his rights; the officers did not threaten or coerce him; he was familiar with the criminal justice system at the time of the interrogation; and that he was not impaired to a substantial degree at the time he waived his *Miranda* rights. [ECF No. 34 at 4–7].

**A. An evidentiary hearing is unnecessary.**

Blackford requests an evidentiary hearing. [ECF No. 28 at 10]. The decision to hold an evidentiary hearing on a motion to suppress is a matter of discretion for the trial court. *United States v. Pettigrew*, 468 F.3d 626, 638 (10th Cir. 2006). "An evidentiary hearing may be appropriate when there are material facts in dispute relevant to the motion to suppress." *Id*. The underlying facts are not in dispute because both parties rely on a video recording of the interview. *Compare* [ECF No. 28-1] *with* [ECF No. 34-1]. Rather than disputing the facts, the parties disagree about the legal

5

consequences of what happened. Because the parties do not dispute the underlying facts, the Court will not hold an evidentiary hearing.

### B. Waivers of *Miranda* rights must be made knowingly, intelligently, and voluntarily.

In *Miranda v. Arizona*, the Supreme Court held that when an individual is subjected to custodial interrogation, he "must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." 384 U.S. 436, 479 (1966). The individual must also "be afforded [an opportunity to exercise their rights] throughout the interrogation." *Id*. "After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently" waive his rights. *Id*. If the interrogating authorities do not take care to follow this procedure, "no evidence obtained as a result of interrogation can be used against" the individual. *Id*.

In determining whether a defendant has waived his *Miranda* rights, a court must "evaluate two distinct dimensions of the waiver—its voluntariness and knowingness." *United States v. Perez*, 127 F.4th 146, 167 (10th Cir. 2025) (internal quotation marks and citation omitted). "The government bears the burden of showing by a preponderance of the evidence that the defendant

6

voluntarily and knowingly waived his *Miranda* rights." *Id.* (citation omitted) "Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Id.* (internal quotation marks and citation omitted).

For a defendant to "knowingly" waive his *Miranda* rights, "the waiver must be made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* (internal quotation marks and citation omitted). Relevantly, "when a defendant is read his *Miranda* rights ... and agrees to waive those rights, that typically does the trick." *Id.* at 169 (internal quotation marks and citation omitted).

A defendant's "waiver must be voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id.* at 167. (internal quotation marks and citation omitted). Courts consider relevant factors when determining whether a *Miranda* waiver was voluntary: "[1] the suspect's age, intelligence, and education; [2] whether the suspect was informed of his or her rights; [3] the length and nature of the suspect's detention and interrogation; and [4] the use or threat of physical force against the suspect." *Id.* (internal quotation marks and citation omitted). The ultimate question is "whether the government obtained the statements by physical or psychological coercion such that the

7

defendant's will was overborne." *Id*. (internal quotation marks and citation omitted).

### C. Blackford knowingly, intelligently, and voluntarily waived his *Miranda* rights.

Blackford does not argue that the substance of the *Miranda* warning was deficient. Nor does anyone dispute that he was subjected to custodial interrogation. Instead, Blackford takes issue with how quickly Hanna read him his rights, that she did not provide "any introduction or signal that she was about to read him his rights," and that Hanna downplayed the moment she read Blackford his rights. [ECF No. 28 at 6–8]. Blackford relies on two cases: *Doody v. Ryan*, 649 F.3d 986 (9th Cir. 2011) (en banc) and *New Jersey v. O.D.A.-C.*, 273 A.3d 413 (N.J. 2022). Setting aside the fact that neither case is binding on this Court, both are meaningfully distinguishable from this case.

In *Doody*, which involved the review of a federal habeas petition, the petitioner was a juvenile at the time of the interrogation. 649 F.3d at 1002. The law enforcement official who questioned the petitioner said that he should not take the *Miranda* warnings out of context and implied that they were mere formalities. *Id*. Additionally, law enforcement officials repeatedly assured the petitioner that he was not suspected of wrongdoing, and one of the officials "deviated from the form containing the juvenile *Miranda*

warnings, and ad libbed that [petitioner] had the right to counsel *if* [he] was involved in a crime." *Id.* at 1002–03 (emphasis in original).

None of that happened in this case. Hanna read Blackford his *Miranda* rights, clearly informed him that he was suspected of wrongdoing, and did not substantively undercut the warnings. The only appreciable deviation from the required warning was Hanna's statement that the lawyer to be appointed to Defendant could be either male or female, not just male. Blackford's argument focuses on the speed with which Hanna covered the *Miranda* warnings, and he argues that there was no pre-warning introduction or a warning to the warning. The Court is not aware of any such requirement, and Blackford cites no specific authority for this position. Hanna did cover the warnings quickly, but she provided the warnings at the beginning of the interview. She spoke at a normal pace and volume, asked Blackford if he understood his rights, and he affirmatively acknowledged that he understood those rights. Therefore, *Doody* is inapposite.

*New Jersey* is also distinguishable. In *New Jersey*, law enforcement officials repeatedly and specifically downplayed and undercut the *Miranda* warnings during a custodial interview. For example, the defendant was told that the *Miranda* warnings were just a formality, that the interrogation would be confidential, and that the statements would not be used against him or hurt him. 273 A.3d 413, 422–23. Again, that did not happen here.

9

In Blackford's view, "a reasonable person in [his] shoes might well have missed the significance of the words being relayed to him due to [Hanna's] downplaying of the moment." [ECF No. 28 at 7]. He further argues that Hanna's "long-winded statements [were] presented as a group[ and a] reasonable person in [his] shoes would have believed that signing the form was essential to continuing without the rights subsequently mentioned because they were conveyed in the same manner and within the same unexplained speech." [*Id*.]. The Court disagrees. As reflected in the recorded interview, Hanna clearly provided Blackford with the required warnings. And although brief, Hanna paused to allow Blackford to affirmatively acknowledge his rights before continuing with additional questions.

### 1. *Blackford knowingly and intelligently waived his Miranda rights.*

A court can find a waiver based on a defendant's course of conduct, including the fact that a defendant answers questions after receiving a *Miranda* warning. *See United States v. Perez*, 127 F.4th 146, 170 (10th Cir. 2025). Here, Blackford immediately began answering questions after he acknowledged his *Miranda* rights. He was 45 years old at the time of the interview, had completed the 11th grade, and the Court did not observe any indication in the video that Blackford failed to understand the *Miranda*

warnings. He was sufficiently informed of his rights, and the interview was brief, lasting approximately 14 minutes.

Blackford did not ask for any clarification about his rights, and he did not appear to have any trouble hearing Hanna. He appeared lucid, engaged, and provided appropriate and reasonably prompt answers to the questions he was asked throughout the interview. In fact, when Hanna informed him that this case would "go federal" because of he is an Indian, he specifically referenced the case of *McGirt v. Oklahoma*, 591 U.S. 894 (2020). Blackford demonstrated that he appreciated not only the circumstances of why he was being interviewed, but he understood the legal landscape. And as the government points out, this was not Blackford's first encounter with law enforcement. Defendants "with prior experience in the criminal justice system are more likely to have knowingly waived their *Miranda* rights because [t]he concepts encompassed by *Miranda* [are] not foreign to them." *United States v. Goebel*, 959 F.3d 1259, 1269 (10th Cir. 2020) (internal quotation marks and citation omitted). The pretrial services report attached to the government's response catalogs Blackford's involvement in the criminal justice system beginning at age 16, with nearly three dozen identified incidents since then. [ECF No. 23-2 at 5–15]. Based on these factors, and based on the totality of the circumstances, the Court finds that Blackford knowingly and intelligently

11

waived his *Miranda* rights by continuing to answer questions after being provided with the required warnings.

### 2. *Blackford voluntarily waived his Miranda rights.*

After Hanna provided the required warnings, Blackford affirmatively acknowledged his rights and voluntarily answered questions. The interrogation was confrontational in the sense that all interrogations are confrontational to some degree. But the officers did not engage in any physical or psychological coercion. Nor did they unduly mislead Blackford..

Based on the above-listed reasons, the Court finds that the *Miranda* warnings provided to Blackford were proper, and that he knowingly, intelligently, and voluntarily waived those rights during his custodial interrogation on February 3, 2023.

### D. Blackford had a sufficient opportunity to invoke his Fifth Amendment rights.

As shown above, the Court finds that Hanna provided Blackford with a sufficient opportunity to invoke his *Miranda* rights. She specifically asked him if he understood his rights, and he affirmatively acknowledged his understanding. The *Miranda* warning included a warning that he could stop answering questions at any time. The *Miranda* warnings were not read so fast as to prohibit comprehension, and Blackford briefly paused to acknowledge his rights. That, coupled with the occasional lulls in the

interrogation, shows that Blackford understood his rights and chose not to invoke them.

Blackford contends that Hanna "continuously interrupted" his attempts to read the *Miranda* warning form she provided to him. The Court disagrees with Blackford's characterization that Hanna "continuously interrupted" him. Some of the questions and answers between Blackford and Hanna overlapped, but not any more than what occurs in normal conversation. Hanna's interruptions were not so continuous or overbearing that Blackford did not have sufficient opportunity to exercise his rights. Further, Blackford cites no authority, and the Court is not aware of any, for the proposition that a defendant must be given an opportunity to read and sign a written acknowledgement and/or waiver for the *Miranda* waiver to be effective.

Finally, Blackford argues that Hanna's conduct is "especially problematic considering [she] state[d] that she [was] aware of [Blackford's] meth addiction" because methamphetamine use causes "significant physical and mental problems." [ECF No. 28 at 9–10]. But methamphetamine use alone—even active intoxication—is not enough to invalidate a *Miranda* waiver. *United States v. Varela*, 576 F. App'x 771, 780 (10th Cir. 2014) (affirming denial of motion to suppress statement of defendant who asserted he was "high on methamphetamine at the time of the interview"). The standard is not whether someone is a drug user, or even whether someone is under the

13

influence during an interrogation. Rather, the question is whether an individual's intoxication or impairment rises to the level of "substantial impairment" that would render a statement unknowing or involuntary. *Coddington v. Sharp*, 959 F.3d 947, 960 (10th Cir. 2020).

Based on the totality of the circumstances presented in the video recorded interrogation , the Court finds that if Blackford were impaired at all, he was not impaired to such a degree that his *Miranda* waiver was not knowingly, intelligently, and voluntarily made. Blackford appeared lucid and engaged throughout the interview. He provided appropriate and reasonably prompt answers to the questions he was asked, and he appeared to fundamentally understand what was going on. When Blackford was informed that his case would "go federal" due to his status as an Indian, he immediately connected that information to the exact Supreme Court case that decided the issue. These are all signs that he was not substantially impaired.

Blackford was given a sufficient opportunity to invoke his rights, and his intoxication and/or impairment (if any) was not enough to invalidate his *Miranda* waiver.

## III. <u>Conclusion</u>

For the reasons set forth above, Blackford's motion to suppress is denied.

IT IS THEREFORE ORDERED that the motion to suppress [ECF No. 28] is DENIED.

DATED this 8th day of September, 2025.

_____
Sara E. Hill
UNITED STATES DISTRICT JUDGE